**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John L. WARREN, Jr., David DeFina, Des E. Schick and Thomas A. Warren, Defendants-Appellants.**

**No. 75–4368.**

United States Court of Appeals, Fifth Circuit.

Feb. 11, 1980.

Daniel S. Pearson (court-appointed), Miami, Fla., for John L. Warren.

Sky E. Smith (court-appointed), Miami, Fla., for David DeFina.

Alan Medof (court-appointed), Miami, Fla., for Des E. Schick.

Stewart E. Parsons (court-appointed), Chattahoochee, Fla., for Thomas A. Warren.

Jamie L. Whitten, Asst. U. S. Atty., Miami, Fla., Lewis M. Fischer, Atty., Appellate Section, Crim. Div., Andrew S. Gordon, Washington, D. C., for defendants-appellants.

Before COLEMAN, Chief Judge, BROWN, GOLDBERG,* AINSWORTH, GODBOLD, CHARLES CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, VANCE and KRAVITCH, Circuit Judges.**

JOHN R. BROWN, Circuit Judge:

We granted this second rehearing en banc in order to consider policy factors bearing

* Judge GOLDBERG, who participated in the submission of this case, took Senior status as of January 31, 1980 and is therefore no longer qualified to be a member of the Court en banc.

** Judges FRANK M. JOHNSON, Jr., GARZA, HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, SAM D. JOHNSON and THOMAS A. CLARK have become members of the Court since June 5, 1979, when this case was taken under submission. They do not wish to participate in the decision.

1. Our previous en banc opinion invoked the concurrent sentence doctrine in order to pretermit review of the currency violation of which defendants John and Thomas Warren were convicted and sentenced concurrently with their violations of the narcotics laws. *United States v. Warren*, 5 Cir., 1978, 578 F.2d 1058, 1076–77 (*Warren II*), rev'g, 5 Cir., 1977, 550 F.2d 219 (panel decision) (*Warren I*).

2. We expressly reaffirm all portions of *Warren II*, except for the small portion pertaining to the use of the concurrent sentence doctrine. In particular, our reversal of the currency violation convictions has no effect on the narcotics convictions, *see* 578 F.2d at 1077 n. 17, nor does it affect *Warren I*'s disposition of the convictions of David DeFina and Des Schick, *see id.* at 1077.

on the use of the concurrent sentence doctrine,[1] by which we avoided passing upon the correctness of the defendants' currency violation convictions and the underlying correctness of our earlier decisions in *United States v. Granda*, 1978, 565 F.2d 922, and *United States v. Schnaiderman*, 1978, 568 F.2d 1208. We have carefully considered the arguments set out in the briefs, but conclude that since the full Court agrees with those decisions this case is no longer a vehicle for consideration of the policies underlying the concurrent sentence doctrine. Thus we express no opinion whatsoever on the use of the concurrent sentence doctrine in this Circuit. We simply reverse on the merits the currency violation convictions of John and Thomas Warren.[2]

The Warrens were convicted of transporting more than $5,000 beyond a United States border without filing the report required by 31 U.S.C.A. § 1101(a)(1)(A), in violation of 31 U.S.C.A. § 1058. Those statutes require that the

For the sake of completeness, a brief history of the proceedings in this case since *Warren II* is appropriate. On January 24, 1979, we granted a second rehearing en banc, 589 F.2d 254, solely to consider the concurrent sentence doctrine and its application here. But because of the independent nature of the previously affirmed narcotics convictions, we refused to stay the mandate as to those convictions. Our unpublished order of February 2, 1979, stated that ". . . the Court's decision on the reserved issues will have no affect on the confinement under the other convictions which were affirmed by the Court's earlier en banc decision." The Warrens then petitioned this Court for a rehearing on the mandate decision, and that petition was denied by unpublished order of March 2, 1979. Then the Warrens applied to the Supreme Court for a stay. Mr. Justice Rehnquist, in his capacity as acting Circuit Justice, responded in the Warrens' favor. He ordered that ". . . the application [for a stay] be treated as an application for continuance of bail, which application is granted pending disposition of the issue now pending on rehearing and shall terminate automatically upon final disposition of that issue. After disposition of that issue, and in the event certiorari may be sought, application for bail should first be made in the Court of Appeals." *Warren v. United States*, No. A–905 (May 10, 1979) (unpublished order).

proscribed acts be done "knowingly" and "willfully", respectively. Panels of this Court have held that those words make it necessary that the defendant have *actually known* of the currency reporting requirement and have voluntarily and intentionally violated that known legal duty in order to be convicted of the crime. *United States v. Granda*, 5 Cir., 1978, 565 F.2d 922; *United States v. Schnaiderman*, 5 Cir., 568 F.2d 1208, *rehearing and rehearing en banc denied*, 1978, 573 F.2d 1039. Thus where defendants have not been specifically warned of the reporting requirement prior to being arrested for the crime, the resulting convictions have been reversed as a matter of law. We approve of this interpretation of the currency reporting statutes. The only substantial difference between the instant case and those previously interpreting the statutes is that this case involves the surreptitious transportation of currency across the border at other than a permanent customs checkpoint. We find this difference to be immaterial, and accordingly reverse the Warrens' currency violations as a matter of law.

The relevant facts are adequately described in our prior opinions.[3] The Warrens were stopped after sailing across the border and were found in possession of $41,500 in United States currency and 46,800 Colombian pesos, none of it reported. The record is clear that prior to their arrest the Warrens were not advised of the existence of the reporting requirement,[4] nor did the Government introduce any evidence at trial to show that they already knew of the requirement, nor were they given the opportunity to subsequently file a report concerning the currency.

*Granda* and *Schnaiderman* reversed currency violation convictions where money had been transported into the United States by way of border checkpoints in airports. Cases in other circuits have been in accord with our holdings in *Granda* and *Schnaiderman*, but they too involved only currency transportation by way of a regular border checkpoint. *United States v. San Juan*, 2 Cir., 1976, 545 F.2d 314 (entered by bus from Canada, passing through regular border checkpoint); *United States v. Rodriguez*, 9 Cir., 1979, 592 F.2d 553 (entry through international airport); *United States v. Shui-Yee Shirley Chen*, 9 Cir., 1979, 605 F.2d 433 (entry through international airport).

█ Because the Warrens set sail from Florida without passing through any regular border checkpoints, this case is the first in which it is arguably impossible for the Government to *easily* place travelers on notice of the currency reporting requirement. But the words "knowingly" and "willfully" as read by us apply to ingress and egress of currency alike, and nowhere does the statute distinguish between the ways in which the border is crossed.

---

**3.** The testimony of Customs Patrol Officer Wallace is not recounted by prior opinions, yet is relevant to the Warrens' currency violation convictions. The relevant testimony concerns the questioning of the Warrens soon after boarding of their vessel by the Coast Guard, and reveals that the Warrens were not specifically nor adequately warned of the currency reporting requirement prior to being arrested and charged with the crime:

Well, I thought somebody must have some money here, and I believe I asked John Warren and he said he just had a negligible amount also.

I asked Tommy Warren and he said he had a couple of thousand dollars.

I said, "Well, you know, what do you consider a couple of thousand dollars?"

He said, "Well, you know, I might have $5,000;" or I forget the specific amounts.

So I asked him—I said, "Well, do you have more than $5,000?"

He said, "Well, I might have $7,000."

I asked him if he reported it and filled out the proper forms for taking the money out of the country and he advised me he did not.

At this time I asked him if I could see the money.

Other witness accounts are substantially identical. It is also significant that by the time that Officer Wallace made his vague reference to the currency reporting statutes, the currency had already been transported outside of the United States.

**4.** The *Schnaiderman* panel stated that even the defendant's "acknowledged awareness of 'U.S. currency laws' is too vague and unspecific to satisfy the *Granda* standards." 568 F.2d at 1212.

■ In enacting the currency reporting statutes, moreover, Congress sought to avoid damage to international trade and commerce.[5] Incident to that concern was an appreciation that travelers are both a part of and creators of international trade and commerce.

Furthermore, requiring notice of the responsibility to report the existence of currency before imposing criminal consequences fits in with the statutory scheme. The act of taking money in excess of $5,000 out of the country "is not illegal or even immoral. What is required is merely a filing of the proper form." *Granda, supra* at 926. In most cases, the mere transportation of money is an *innocent act*, more akin to being present in a city[6] than to transferring weapons.[7] *See United States v. San Juan, supra* at 319 (". . . these reporting provisions . . . require the registration of an otherwise innocent item, . . . on which duty is not generally collected.")[8]

Since the full Court now adopts *Granda* and *Schnaiderman*, the currency violation convictions of John and Thomas Warren are reversed, and the District Court is directed to enter a judgment of acquittal as to those convictions. In all other respects and as to all other defendants, our previous en banc disposition is reaffirmed.

The mandate shall issue forthwith for the Warrens' narcotics convictions.

**REVERSED IN PART, AFFIRMED IN PART.**

RONEY and JAMES C. HILL, Circuit Judges, with whom CHARLES CLARK, FAY and VANCE, Circuit Judges, join, concurring in part and dissenting in part:

We concur in the result reached in this case, but we dissent from the majority's failure to address the concurrent sentence doctrine.

Little useful can be done by a minority opinion because application of a concurrent sentence doctrine is a matter of judicial policy about which the Court has a good deal of discretion. We would join a majority in setting that policy. Nevertheless, it may be useful to summarize the precise arguments presented on rehearing in this case, to set forth briefly the history and prior use of the concurrent sentence doctrine in this Court and its application in other circuits, and to suggest some problems which the Court needs to confront, and should have settled here.

In an unusual procedure on a case already once heard *en banc*, we granted a rehearing solely "on the concurrent sentence issue." *United States v. Warren*, 589 F.2d 254 (5th Cir. 1979).

In the original *en banc* opinion, convictions for violation of 31 U.S.C.A. §§ 1058, 1101, were affirmed under the concurrent sentence doctrine, even though there were previous decisions by this Court that would have required reversal. *See United States v. Warren*, 578 F.2d 1058, 1076–77 (5th Cir. 1978). Supplemental briefing was requested and extensive briefing was received on three issues:

5. The legislative history states:
   In devising legislation to repair this huge gap in law enforcement, your committee considered it *of high importance* . . . not to create obstacles to the free flow of legitimate international trade and commerce.
   H.R.Rep.No.975, 91st Cong., 2d Sess. [hereinafter cited as House Report], *reprinted in* [1970] U.S.Code Cong. & Admin.News, pp. 4394, 4398.

6. *Lambert v. California*, 1957, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (without proof of scienter, felon cannot be convicted of being in Los Angeles for more than five days without registering). See *United States v. Freed*, 1971, 401 U.S. 601, 608, 91 S.Ct. 1112, 1118, 28

L.Ed.2d 356, 362 ("Being in Los Angeles is not *per se* blameworthy.")

7. *United States v. Freed, supra* (no need to show scienter where grenade involved); *United States v. Mayo*, 1974, 162 U.S.App.D.C. 171, 498 F.2d 713 (sawed-off shotgun).

8. The legislative history points out:
   The bill imposes no legal limitation on the export of U.S. currency from the United States to foreign jurisdictions. Those leaving the United States have always been free to take with them such mounts of cash or other forms of money as they choose.
   House Report, *supra*, [1970] U.S.Code Cong. & Admin.News at p. 4398.

(1) What guidelines should be applied by the Court of Appeals in deciding whether or not to review a conviction on which the sentence received is concurrent with a sentence received on another conviction, which either has not been appealed or has been affirmed on appeal?

(2) Applying these guidelines to this case, should the Court review the conviction of Thomas A. Warren and John L. Warren, Jr. for violation of 31 U.S.C. §§ 1058, 1101 (1970)?

(3) Assuming that those convictions are to be reviewed, what are the merits of the appeal?

After all this, the Court does nothing whatsoever to resolve the uneven application of the concurrent sentence doctrine in this Circuit. It does, however, review and reverse the convictions, saying only that since the full Court agrees the convictions should be reversed under two prior precedents, it will simply reverse the convictions and express no opinion on the use of the concurrent sentence doctrine.

Thus, the *en banc* Court seemingly has set this precedent: when the law of the Circuit clearly mandates reversal of any criminal conviction, that conviction should be reviewed and reversed, even though the sentence therefor was concurrent with other valid convictions, without regard to whether adverse consequences would flow from the concurrent sentence.

Because the briefs argue that adverse collateral consequences would result from the sentences, however, the majority opinion's silence on the point makes it impossible to know how this argument may have affected the judgment of members of the Court. The Court, it seems to us, has failed on two scores: first, it has failed to definitely articulate the premise of its decision so that it can serve as a sure precedent; second, in an area of the law that is confused by uneven precedents, it has failed to provide needed guidance for application of the admittedly discretionary concurrent sentence doctrine.

## Guidelines Suggested by Parties

In the briefs submitted to this *en banc* Court, defendants argue their currency convictions should be reviewed despite the concurrent sentence doctrine, or, to be more precise, should be reviewed under certain suggested guidelines for the use of the doctrine. A brief summary of defendants' proposals suggests a broad range of concurrent sentence issues. The following are guidelines under which defendants contend their concurrent convictions should be reviewed:

*First*, the concurrent sentence doctrine should not preclude review of clearly invalid convictions. *See United States v. Evans*, 572 F.2d 455, 476–77 (5th Cir.), *cert. denied*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978). Judicial resources are not substantially depleted if reversal of the convictions is mandated by clear precedent.

*Second*, if there is a reasonable possibility that the reviewed conviction will be reversed in subsequent proceedings, the concurrent sentence doctrine should not foreclose review of other convictions. *See Benton v. Maryland*, 395 U.S. 784, 792–93, 89 S.Ct. 2056, 2061, 23 L.Ed.2d 707 (1969).

*Third*, if the reviewed conviction was substantially affected by a legal issue raised in the concurrent appeal, the concurrent sentence doctrine should not be applied. In this case, defendants contend that probable cause for the search which led to their marijuana conspiracy convictions depended in part on the validity of the unreviewed currency convictions, *see United States v. Warren*, 578 F.2d at 1084–85 n. 6 (Fay, J. dissenting), a contention rejected by both *en banc* opinions, 578 F.2d at 1077 n. 17, and *ante*, at 889 n. 2.

*Fourth*, the concurrent sentence doctrine should not apply if there is "any possibility" that the defendant will suffer adverse collateral consequences from the conviction. *See United States v. Tanner*, 471 F.2d 128, 140 (7th Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220 (1972). They assert the following adverse collateral consequences could flow from their convictions:

1. *Parole.* The convictions may have a detrimental impact on parole opportunities. *See United States v. Rubin*, 591 F.2d 278 (5th Cir.), *cert. denied*, —— U.S. ——, 100 S.Ct. 133, 62 L.Ed.2d 87 (1979).

2. *Impeachment.* These convictions might subject defendants to impeachment as witnesses in subsequent civil or criminal proceedings. *See Benton v. Maryland*, 395 U.S. at 791, 89 S.Ct. at 2060; *Government of Canal Zone v. Castillo*, 568 F.2d 405, 406 (5th Cir.), *cert. denied*, 436 U.S. 910, 98 S.Ct. 2248, 56 L.Ed.2d 410 (1978). Under Fed.R. Evid. 609(a)(2), even though the conspiracy convictions might not be usable at trial, defendants contend they could be impeached in a federal court with the currency convictions because those convictions might be viewed as involving "dishonesty or [a] false statement."

3. *Enhancement of sentence in future conviction.* The convictions could have the consequence of enhancing a subsequent sentence by operation of a recidivist statute.

Defendants propose the following additional guidelines for the application of the concurrent sentence doctrine which would not apply to the circumstances of their convictions:

The concurrent sentence doctrine should not preclude review of a conviction if there exists a reasonable possibility that the sentence on the reviewed and affirmed conviction was enhanced because of the multiple convictions. *See Sanders v. United States*, 541 F.2d 190, 194 (8th Cir. 1976), *cert. denied*, 429 U.S. 1066, 97 S.Ct. 796, 50 L.Ed.2d 784 (1977).

Nor should it apply if there is a reasonable possibility that evidence admitted on one conviction, and admissible only as to that conviction, affected the finding of guilt on the reviewed and affirmed conviction. *See United States v. Darnell*, 545 F.2d 595, 598 (8th Cir. 1976), *cert. denied*, 429 U.S. 1104, 97 S.Ct. 1134, 51 L.Ed.2d 556 (1977).

They advance three additional adverse collateral consequences which could flow from a conviction:

1. *Stigma.* Although any criminal conviction is likely to be stigmatizing to some extent, defendants refer to the approbation attaching to particular types of crime. *See United States v. Thomas*, 148 U.S.App.D.C. 148, 151–52, 459 F.2d 1172, 1175–76 (D.C. Cir. 1972) (cruelty to a child).

2. *Deportation.* Because an alien may be deported if "convicted of two crimes involving moral turpitude," 8 U.S.C.A. § 1251(a)(4), review of a conviction which would count toward that threshold is essential.

3. *Forfeiture.* Although it is not now a factor in this case because of a stipulation with the Government, a forfeiture of property, employment opportunities or civil rights may often be a collateral consequence of a conviction. *See United States v. Farrell*, 609 F.2d 816, 817–818 (5th Cir. 1980); *Ivers v. United States*, 581 F.2d 1362, 1366–67 (9th Cir. 1978).

A well prepared brief thoroughly discussing the guideline question was submitted by the Department of Justice. It urges retention of the concurrent sentence doctrine as a rule of judicial efficiency, not for the benefit of the Government, nor for the convenience of the judges or the Court, but for the benefit of other litigants whose cases are waiting to be heard.

The Government argues that an exception to the concurrent sentence doctrine whenever there is, as argued by the defendants, "any possibility" of collateral adverse consequences would effectively swallow the doctrine. As an alternative, it proposes that the doctrine apply unless there is a "real possibility" that the conviction "will have an appreciable impact on a party's substantial rights." This standard is likened to the "plain error" test of Fed.R. Crim.P. 52(b), which provides that, at trial, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

The Government in many instances agrees with the guidelines suggested by defendants. It extensively briefs the possi-

ble effects on parole, and other specific adverse collateral consequences argued by defendants. It argues that the "nature and substantiality" of the consequences should determine whether or not to apply the concurrent sentence doctrine.

With all of these suggestions before the Court, we think this case ideal for providing an authoritative decision in this field of the law.

## Brief History

The history of the concurrent sentence doctrine was reviewed briefly by the Supreme Court in *Benton v. Maryland*, 395 U.S. at 788–91, 89 S.Ct. at 2059–2061. According to *Benton*, the doctrine was first applied to multi-count criminal indictments by the Supreme Court in *Claassen v. United States*, 142 U.S. 140, 12 S.Ct. 169, 35 L.Ed. 966 (1891), and was thereafter "widely, if somewhat haphazardly, applied" in Supreme Court opinions. *Benton v. Maryland*, 395 U.S. at 789, 89 S.Ct. at 2059. The Court in *Benton* rejected the notion that the doctrine is jurisdictional, holding that it does not bar consideration of challenges to multiple convictions. The Court did state, however, that the doctrine may have some continuing validity as a rule of judicial convenience and as a matter of discretion. Justice White's concurring opinion noted that the concurrent sentence doctrine "is not a rule of convenience to the judge, but rather of fairness to other litigants," because it permits more efficient use of scarce judicial resources. *Id.* at 799, 89 S.Ct. at 2065 (White, J., concurring).

The doctrine was applied in this Circuit at least as early as 1898, *Porter v. United States*, 91 F. 494 (5th Cir. 1898), and frequently in subsequent cases. *See, e. g.*, *United States v. Kelly*, 569 F.2d 928 (5th Cir.), *cert. denied*, 439 U.S. 829, 99 S.Ct. 105, 58 L.Ed.2d 123 (1978); *Yielding v. United States*, 173 F.2d 46 (5th Cir. 1949); *Levi v. United States*, 71 F.2d 353 (5th Cir. 1934); *Greene v. United States*, 154 F. 401 (5th Cir.), *cert. denied*, 207 U.S. 596, 28 S.Ct. 261, 52 L.Ed. 357 (1907). While language in some earlier opinions could give the impres-

sion that the rule is mandatory, *Milam v. United States*, 340 F.2d 956, 957 (5th Cir. 1965) ("In these circumstances it is established that if the conviction is valid on either count, the judgment must be affirmed"); *Morales v. United States*, 228 F.2d 762, 763 (5th Cir. 1956) (conviction "should" be affirmed), it is now well settled that application of this doctrine is a matter of discretion. *United States v. Dumenigo*, 444 F.2d 253 (5th Cir.), *cert. denied*, 404 U.S. 885, 92 S.Ct. 223, 30 L.Ed.2d 168 (1971); *United States v. Casey*, 428 F.2d 229 (5th Cir.), *cert. denied*, 400 U.S. 839, 91 S.Ct. 78, 27 L.Ed.2d 73 (1970).

## Adverse Collateral Consequences

The effect of adverse collateral consequences on the application of the doctrine, argued by both briefs, has developed some substance in the cases.

The Supreme Court in *Benton v. Maryland* declined to invoke the concurrent sentence rule because it felt that there was a possibility of collateral consequences resulting from the defendant's second conviction. It would now appear that an "adverse collateral consequence" of the conviction mandates review. In *United States v. Rubin*, 559 F.2d 975 (5th Cir. 1977), *vacated and remanded*, 439 U.S. 810, 99 S.Ct. 67, 58 L.Ed.2d 102 (1978), this Court pretermitted review on two convictions by applying the concurrent sentence doctrine. The Solicitor General suggested to the Supreme Court that the concurrent sentence doctrine should not have been applied because of possible adverse effects of the unreviewed but affirmed convictions on defendant's parole opportunities. The Supreme Court granted certiorari, vacated the judgment, and remanded the case to this Court "for further consideration in light of the position presently asserted by the Solicitor General . . . ." *Rubin v. United States*, 439 U.S. 810, 99 S.Ct. 67, 58 L.Ed.2d 102 (1978). The Supreme Court expressed no view on the merits of that position but the Fifth Circuit subsequently reviewed the two convictions, declining to apply the doctrine because it found "a significant likelihood that

the defendant will suffer adverse collateral consequences from the unreviewed conviction[s]." *United States v. Rubin,* 591 F.2d at 280.

Other cases in this Circuit have alluded to an adverse collateral consequence exception to the concurrent sentence doctrine. *See, e. g., United States v. Vasquez-Vasquez,* 609 F.2d 234, 235 (5th Cir. 1980); *United States v. Evans,* 572 F.2d at 476–77; *United States v. Binetti,* 547 F.2d 265, 269 (5th Cir.), *modified on other grounds on rehearing,* 552 F.2d 1141 (1977); *Government of Canal Zone v. Fears,* 528 F.2d 641, 644 (5th Cir. 1976); *United States v. Strickland,* 509 F.2d 273, 274 (5th Cir. 1975).

Other circuits likewise have not applied the doctrine when adverse collateral consequences may flow from convictions with concurrent sentences. *See, e. g., United States v. Ramos Algarin,* 584 F.2d 562, 568 (1st Cir. 1978); *United States v. Daley,* 564 F.2d 645, 647 n. 2 (2d Cir. 1977), *cert. denied,* 435 U.S. 933, 98 S.Ct. 1508, 55 L.Ed.2d 530 (1978); *United States v. Maze,* 468 F.2d 529, 536 n. 6 (6th Cir. 1972), *aff'd,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); *United States v. McLeod,* 493 F.2d 1186, 1189 (7th Cir. 1974); *United States v. Darnell,* 545 F.2d at 598; *United States v. Walls,* 577 F.2d 690, 699 (9th Cir. 1978), *cert. denied,* 439 U.S. 893, 99 S.Ct. 251, 58 L.Ed.2d 239 (1978).

The cases have not settled, however, important questions concerning the application of this exception: is the mere "possibility" of adverse collateral consequences, as suggested by defendants, enough, or is a stronger showing required, as argued by the Government?; who has the burden of showing the adverse collateral consequences, or the lack thereof? *See* Comment, *The Collateral Consequences Exception to the Concurrent Sentence Doctrine,* 44 Temp.L.Q. 385 (1971).

The District of Columbia Circuit has adopted the practice of vacating a concurrent sentence imposed on multiple convictions of similar or included offenses when it is convinced that no adverse collateral consequences will flow from the conviction.

*See, e. g., United States v. Caldwell,* 178 U.S.App.D.C. 20, 53, 543 F.2d 1333, 1367 (D.C. Cir. 1974), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); *United States v. Hooper,* 139 U.S.App.D.C. 171, 432 F.2d 604 (D.C. Cir. 1970); *Fuller v. United States,* 132 U.S.App.D.C. 264, 286, 310 n. 52, 407 F.2d 1199, 1221, 1233 n. 52 (D.C. Cir. 1968) (*en banc*), *cert. denied,* 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125 (1969). In *United States v. Hooper,* the court, in vacating what it regarded as a superfluous judgment, noted that vacation of the judgment "does not impair any need of the government, avoids the possibility of adverse collateral consequences to defendant, and furthers the general interest of the administration of justice . . . ." 139 U.S.App.D.C. at 173, 432 F.2d at 606. The court observed,

> The vacation of the judgment does not destroy the jury verdict, but is rather equivalent in practical effect to a suspension of the imposition of sentence. If it later develops that the interest of justice so requires, the sentence can be reimposed on a concurrent basis. The conviction could then be subject to appellate review.

*Id.* 139 U.S.App.D.C. at 173 n. 8, 432 F.2d at 606 n. 8.

### The Need for Decision

A review of the cases in this and other circuits reveals that all have often exercised their discretion to refuse to review concurrent sentences. "That this is the general rule cannot be doubted. That it should not be made a fetish is equally clear." 2 C. Wright, Federal Practice and Procedure: Criminal § 527 at 422–23 (1969).

The widespread haphazard application of the doctrine has been well-documented. Comment, *The Concurrent Sentence Doctrine After Benton v. Maryland,* 7 U.C.L.A.–Alas.L.Rev. 282 (1978). In this and another law review article, a number of issues are thoughtfully presented and thoroughly discussed. Comment, *The Federal Concurrent Sentence Doctrine,* 70 Colum.L.Rev. 1099 (1970). It is now time to judicially resolve these issues.

More importantly, perhaps, this Court should decide which party has the burden of persuasion in the appellate court, an issue which this Court still has not consistently or authoritatively decided. In *United States v. Evans*, 572 F.2d at 477, the Court declined to apply the doctrine because the Government had "not affirmatively demonstrated that the likelihood of harm either in the form of collateral consequences or of prejudice in sentencing and at trial was so remote as to be insignificant on the facts." The Court applied the doctrine in *United States v. Strickland*, 509 F.2d at 274, on the other hand, because the defendant had "not shown any reason why the [unreviewed] convictions . . . add anything material to the pains and penalties he will suffer from the [affirmed] conviction." *Accord, United States v. Smith*, 550 F.2d 277, 285 (5th Cir.), *cert. denied*, 434 U.S. 831, 98 S.Ct. 138, 54 L.Ed.2d 105 (1977).

The matter should be resolved to bring uniformity to our decisions, an appropriate role for the *en banc* Court. F.R.A.P. 35(a).

Persons convicted of federal crimes are entitled to an appeal. That right is empty if no court decides the appeal. Under the concurrent sentence doctrine, which is founded solely on a concern for judicial economy, convictions resulting in concurrent sentences often go unreviewed, and yet affirmed, despite "the obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences." *Sibron v. New York*, 392 U.S. 40, 55, 88 S.Ct. 1889, 1899, 20 L.Ed.2d 917 (1968).

The doctrine is only justified by considerations of judicial efficiency. It seems to us appropriate for the Court to develop a checklist of factors to be addressed before the doctrine is applied, to set standards for the consideration of those factors, and to allocate the burden of persuasion between the parties. Then in those cases in which it would seem appropriate to apply the doctrine, the Court should give careful consideration to the practice of the District of Columbia Circuit, which vacates concurrent sentences the court chooses not to review,

subject to reinstatement if the original sentence is overturned. *See United States v. Hooper*, 139 U.S.App.D.C. 171, 432 F.2d 604. For a discussion of the *Hooper* rule, *see* Comment, *The Concurrent Sentence Doctrine After Benton v. Maryland*, 7 U.C.L.A.–Alas.L.Rev. at 295.

Judge Hill would abolish the doctrine insofar as it results in the affirmance of any conviction without review, but would not oppose adoption of the District of Columbia Circuit rule which vacates such concurrent sentences without review. Although we may disagree about what the rule should be, we do agree that, absent guidance from the Supreme Court, the Fifth Circuit should establish definitive guidelines for future application of the concurrent sentence doctrine. We respectfully dissent from its failure to do so in this case.